# MICHELLE DILIETO ET AL. *v.* COUNTY OBSTETRICS AND GYNECOLOGY GROUP, P.C., ET AL.
## (SC 17471)
## (SC 17744)

Palmer, Vertefeuille, Zarella, Schaller and Sullivan, Js.*

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

This case was argued prior to the implementation of the policy of this court to hear all cases en banc.

Argued September 15, 2008—officially released June 29, 2010

*Jeffrey R. Babbin* and *Erika L. Amarante*, with whom, on the briefs, were *Kenneth D. Heath, Kim E. Rinehart, Joseph M. Gillis* and *Seth L. Huttner*, for the cross appellants in Docket No. SC 17471 and the appellants in Docket No. SC 17744 (named defendant et al.).

*William F. Gallagher*, with whom, on the brief, was *Rodney S. Margol*, for the appellee in Docket No. SC 17744 (substitute plaintiff).

*Steven D. Ecker*, for the cross appellee in Docket No. SC 17471 (named plaintiff).

*Opinion*

PALMER, J. In this medical malpractice case, which returns to us for a second time,[1] we consider two sepa-

---

[1] See *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 265 Conn. 79, 828 A.2d 31 (2003).

rate appeals. In the first appeal (Docket No. SC 17744), the defendant Scott Casper, a gynecologist, his employer, the named defendant, County Obstetrics and Gynecology Group, P.C. (County Obstetrics), and the defendant Yale University School of Medicine,[2] appeal from the judgment of the trial court, rendered in accordance with a jury verdict in favor of the substitute plaintiff, Michael J. Daly, trustee of the bankruptcy estate of the plaintiff Robert DiLieto and his wife, the named plaintiff, Michelle DiLieto (DiLieto).[3] The jury found that the defendants negligently had removed DiLieto's reproductive organs and pelvic lymph nodes and awarded Daly $5,200,000. The trial court granted Daly's motion for prejudgment interest pursuant to General Statutes (Rev. to 1997) § 52-192a[4] and rendered

---

[2] The named plaintiff, Michelle DiLieto, and her husband, the plaintiff Robert DiLieto, also named Thomas P. Anderson, Vinita Parkash, Babak Edraki, Peter E. Schwartz, all of whom are physicians, and Yale-New Haven Hospital as defendants. Either the action was withdrawn as to these defendants or they are not parties to this appeal. We refer collectively to Casper, County Obstetrics and Yale University School of Medicine as the defendants.

[3] This action originally was brought by Michelle DiLieto and Robert DiLieto, both of whom subsequently filed for bankruptcy pursuant to 11 U.S.C. § 701 et seq. (1994). Thereafter, Daly was substituted as the plaintiff.

[4] General Statutes (Rev. to 1997) § 52-192a provides in relevant part: "(a) After commencement of any civil action . . . seeking the recovery of money damages, whether or not other relief is sought, the plaintiff may before trial file with the clerk of the court a written 'offer of judgment' signed by him or his attorney . . . offering to settle the claim underlying the action and to stipulate to a judgment for a sum certain. The plaintiff shall give notice of the offer of settlement to the defendant's attorney . . . . Within thirty days after being notified of the filing of the 'offer of judgment' and prior to the rendering of a verdict by the jury or an award by the court, the defendant or his attorney may file with the clerk of the court a written 'acceptance of offer of judgment' agreeing to a stipulation for judgment as contained in plaintiff's 'offer of judgment'. . . .

"(b) After trial the court shall examine the record to determine whether the plaintiff made an 'offer of judgment' which the defendant failed to accept. If the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain stated in his 'offer of judgment', the court shall add to the amount so recovered twelve per cent annual interest on said amount . . . . In those actions commenced on or after October 1, 1981, the interest shall be computed from the date the

judgment for Daly in the amount of $11,110,045.79, including costs. On appeal,[5] the defendants claim that the evidence was insufficient to support the findings of the jury that (1) the defendants' negligence had resulted in the unnecessary removal of DiLieto's reproductive organs and pelvic lymph nodes, (2) DiLieto suffered permanent nerve damage due to the removal of her pelvic lymph nodes, and (3) DiLieto was entitled to damages stemming from the removal of her pelvic lymph nodes. The defendants also claim that the trial court improperly (1) charged the jury on several specifications of negligence that were not supported by the evidence or time barred, or both, and (2) awarded offer of judgment interest pursuant to § 52-192a because the offers of judgment that DiLieto had filed were invalid, and the trial court improperly concluded that the substitution of Daly as the plaintiff retroactively validated them. We reject the defendants' claims of evidentiary insufficiency and instructional error. We agree with the defendants, however, that the trial court improperly concluded that the substitution of Daly retroactively

complaint in the civil action was filed with the court if the 'offer of judgment' was filed not later than eighteen months from the filing of such complaint. If such offer was filed later than eighteen months from the date of filing of the complaint, the interest shall be computed from the date the 'offer of judgment' was filed. The court may award reasonable attorney's fees in an amount not to exceed three hundred fifty dollars, and shall render judgment accordingly. . . ."

General Statutes (Rev. to 1997) § 52-192a was the subject of subsequent amendments in 2001, 2005 and 2007, none of which is applicable to the present case. See Public Acts 2007, No. 07-141, § 16; Public Acts 2005, No. 05-275, § 4; Public Acts 2001, No. 01-71, § 1. Of note, the 2005 amendment substitutes the term "offer of compromise" for the term "offer of judgment." The 2005 amendment, however, is applicable to actions accruing on or after October 1, 2005, the date that the amendment took effect. We therefore refer to the offers in the present case as offers of judgment in accordance with the applicable statutory language. All references to § 52-192a throughout this opinion are to the revision of 1997.

[5] The defendants appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

validated the offers of judgment on file such that interest began to accrue on the date that the action was commenced. We conclude, rather, that the substitution of Daly validated the offers of judgment as of the date of the substitution such that interest began to accrue on that date. Accordingly, we affirm in part and reverse in part the judgment of the trial court.

In the second appeal (Docket No. SC 17471),[6] the defendants claim that the trial court improperly concluded that certain slides containing "recuts" of DiLieto's uterine tissue, which the defendants had sent to outside experts for evaluation in preparation of trial, were part of DiLieto's "health record" and, therefore, were required to be disclosed to her pursuant to General Statutes § 19a-490b (a).[7] We conclude that the defendants' claim is moot because, during the pendency of this appeal, the defendants disclosed the slides to DiLieto, and, therefore, the defendants no longer can be afforded any practical relief. Accordingly, we dismiss the second appeal.

The record reveals the following facts, which the jury reasonably could have found, and the following procedural history. In February, 1995, DiLieto sought

---

[6] We also transferred the second appeal to this court after the defendants had filed this appeal with the Appellate Court.

[7] General Statutes § 19a-490b (a) provides in relevant part: "Upon the written request of a patient or the patient's attorney or authorized representative, or pursuant to a written authorization, an institution licensed pursuant to this chapter shall furnish to the person making such request a copy of the patient's health record, including but not limited to, copies of bills, laboratory reports, prescriptions and other technical information used in assessing the patient's health condition. In addition, an institution shall provide the patient or the patient's designated health care provider with a reasonable opportunity to examine retained tissue slides and retained pathology tissue blocks. Upon the written request of the patient, the patient's attorney or the patient's designated health care provider, an institution shall send the original retained tissue slide or original retained tissue block directly to the patient's designated licensed institution, laboratory or physician. . . ."

treatment from Casper for prolonged menstrual bleeding and cramping in her pelvic region. After a noninvasive mode of treatment proved to be ineffective, Casper recommended that DiLieto, who was forty-three years old at the time, undergo a diagnostic dilation and curettage (D & C)[8] to obtain samples of tissue from the endometrial lining of her uterus. Casper performed the D & C in early April, 1995, and sent the tissue samples to Thomas P. Anderson, a pathologist at Waterbury Hospital, who diagnosed DiLieto's condition as a "florid endometrial stromal proliferation consistent with low grade endometrial stromal sarcoma." Endometrial stromal sarcoma is a rare and potentially deadly malignancy. See, e.g., A. Blaustein, Pathology of the Female Genital Tract (5th Ed. 2002) pp. 586, 592. Although Anderson's diagnosis was not definitive,[9] Casper mistakenly believed that it was conclusive. Consequently, Casper informed DiLieto that she was suffering from a rare and potentially fatal disease, and that the only treatment for it was surgery, that is, a total abdominal hysterectomy to remove her uterus, and a bilateral salpingo-oophorectomy to remove her fallopian tubes and ovaries. Casper also explained to DiLieto that, during the surgery, while she was still under anesthesia, her uterus, after being removed, would be sent to the Yale[10]

---

[8] A D & C involves the dilation of the cervix and the scraping of the endometrial lining of the uterus, often for the purpose of detecting disease associated with the uterus or reducing uterine bleeding. See, e.g., Mosby's Medical Dictionary (8th Ed. 2009) p. 558.

[9] In his deposition testimony, which was entered into evidence at trial, Anderson explained that his pathology report did not provide a definitive diagnosis of endometrial stromal sarcoma and that the term "consistent with" is intended to alert the physician reading the report that the diagnosis is inconclusive and that the patient's condition may be malignant or benign.

[10] In some instances, it is unclear whether certain persons or entities are associated with Yale University School of Medicine, Yale-New Haven Hospital, or both, or whether certain references to "Yale" in the record or transcripts are to the university or to the hospital. In light of this lack of clarity, all references throughout this opinion to "Yale" are to Yale University School of Medicine or Yale-New Haven Hospital, or to both. We refer to Yale University School of Medicine and Yale-New Haven Hospital individually by

pathology department (pathology department) where it would be examined to determine whether the cancer had spread more than 50 percent through the uterine wall. If the cancer had spread to a depth of more than 50 percent, DiLieto then would undergo a pelvic lymphadenectomy, or dissection of the pelvic lymph nodes, for the purpose of determining whether the cancer had spread to other parts of her body. In addition, DiLieto most likely would require postoperative chemotherapy. DiLieto asked Casper whether, in light of the rarity of the disease, she should obtain a second opinion. Casper assured her that it would not be necessary to do so because he intended to send the pathology slides containing her tissue samples for review by the pathology department and the Yale tumor board (tumor board).[11] He also assured her that Peter E. Schwartz, who Casper characterized as one of the best gynecologic oncologists at Yale,[12] would be involved in the management of her case going forward. Finally, Casper informed DiLieto that, if it was determined that she required a pelvic lymph node dissection, Schwartz would perform that portion of the surgery.

DiLieto's pathology slides were sent to the pathology department for a second opinion, as promised, where they were examined by Vinita Parkash, a pathologist employed by Yale. On the basis of her examination of the slides, Parkash advised the tumor board at its April 13, 1995 meeting that she had expanded DiLieto's differ-

---

name.

[11] The Yale tumor board is a multidisciplinary group of physicians who meet weekly to discuss the diagnosis, treatment and management of cancer patients. At a typical meeting, the board reviews a patient's medical record, including the results of any diagnostic tests, and creates a treatment plan by consensus.

[12] Schwartz was an employee of Yale.

ential diagnosis[13] to include two benign conditions, namely, a leiomyoma, also known as a fibroid tumor; see, e.g., J. Berek & E. Novak, Gynecology (14th Ed. 2007) p. 469; and a stromal nodule. See, e.g., A. Blaustein, supra, p. 585. Schwartz, however, was not present at the tumor board meeting when DiLieto's case was discussed. Schwartz later reviewed Parkash's notes from the meeting, but he misread them and did not realize prior to DiLieto's surgery that two benign conditions had been added to her differential diagnosis. Casper also did not attend the tumor board meeting and never inquired either of the pathology department as to the results of its analysis of DiLieto's pathology slides or of the tumor board with respect to its interpretation of those results. Consequently, Casper, too, did not know prior to surgery that two benign conditions had been added to the differential diagnosis. If Casper had known of the differential diagnosis prior to surgery, he would have informed DiLieto that her condition could be benign, and his approach to her treatment would have been different.

Casper performed the hysterectomy and bilateral salpingo-oophorectomy on DiLieto at Yale-New Haven Hospital on May 3, 1995. After DiLieto's uterus was removed, it was sent to the hospital's pathology laboratory for a frozen section analysis.[14] While the frozen section analysis was being performed, Casper called

---

[13] A differential diagnosis is a method of diagnosis that involves a determination of which of a variety of possible conditions is the probable cause of an individual's symptoms, often by a process of elimination. See, e.g., Stedman's Medical Dictionary (28th Ed. 2006) p. 531.

[14] A frozen section is a rapid intraoperative diagnostic procedure whereby the pathologist examines the tissue specimen grossly, with the naked eye or with a magnifying glass, for abnormalities. Any abnormal tissue is immediately frozen, cut into very thin sections and placed onto slides. After examining the slides under a microscope, the pathologist communicates his or her findings to the surgeons in the operating room, usually via intercom. See generally Mosby's Medical Dictionary (8th Ed. 2009) p. 762.

Schwartz' office to inform him that they were ready for him in the operating room. Babak Edraki, a first year gynecologic oncology fellow[15] who had been assigned to perform the surgery with Schwartz, also was contacted. Edraki's understanding was that he and Schwartz were to perform a pelvic lymph node dissection on a patient who just had undergone a hysterectomy and bilateral salpingo-oophorectomy for a confirmed case of endometrial stromal sarcoma. Edraki never had met DiLieto, and he had not reviewed her medical records prior to surgery. Upon being contacted, Edraki paged Schwartz to notify him that Casper was ready for them. Schwartz told Edraki to "go ahead and start" and that "he would be there shortly . . . ." In his March 5, 1998 deposition testimony, which was entered into evidence and read to the jury, Schwartz testified that, by the time he arrived in the operating room, the pelvic lymph node dissection already was under way. Schwartz further testified that, as he was entering the room, the pathologist who had performed the frozen section analysis, Jose Costa, reported over the intercom that there was no evidence of endometrial stromal sarcoma in DiLieto's uterus.[16] By that time, however, Edraki, who was performing his first unsupervised pelvic lymph node dissection, already had removed two of DiLieto's lymph nodes.[17] In doing so, he had made deep incisions into DiLieto's

---

[15] Edraki was a fellow in the Yale gynecologic oncology fellowship program, a two year program for obstetricians and gynecologists who already have completed their four year residency training in obstetrics and gynecology and who seek additional training in the management and treatment of gynecologic cancer. As such, Edraki was an employee of Yale. Except in exigent circumstances, fellows in the Yale gynecologic oncology program are not permitted to perform surgery unless supervised by an attending physician from the program. On the day of DiLieto's surgery, Schwartz was Edraki's supervising attending physician.

[16] In his written report on the frozen section analysis, Costa noted that he had found a nodule in the uterus, which he determined to be a benign fibroid.

[17] DiLieto did not learn until more than one month after the surgery that Edraki, and not Schwartz, had performed the pelvic lymph node dissection.

pelvic region and had inserted between thirty and forty
metal surgical clips[18] to control bleeding. The incisions
were made and surgical clips were placed near DiLieto's
genital-femoral and obturator nerves. Injury to the geni-
tal-femoral and obturator nerves is a known risk of
pelvic lymph node surgery. See, e.g., J. Smith et al.,
An Atlas of Gynecologic Oncology: Investigation and
Surgery (2001) p. 15. The incisions that Edraki made
during the surgery were much closer to the genital-
femoral and obturator nerves than the incisions that
Casper had made during the hysterectomy and the bilat-
eral salpingo-oophorectomy. When Schwartz entered
the operating room, Casper asked him whether they
should discontinue the surgery in light of the frozen
section results. According to Schwartz, after looking
into DiLieto's pelvis and seeing what appeared to be
normal lymph nodes, "[i]t didn't make any sense . . .
to do any more surgery than what [already] had [been]
done at that point," and the surgery was discontinued.[19]

[18] Surgical clips are tiny "B" shaped pieces of metal that are used for,
inter alia, controlling bleeding during surgery. The surgical clips used during
DiLieto's surgery were approximately one-fifth of one inch in length. This
type of surgical clip remains in the patient's body after surgery.

[19] Whether Schwartz was present during the lymph node portion of the
surgery, and whether the surgery began prior to the announcement of the
frozen section results, were vigorously disputed issues at trial. In his trial
testimony, Schwartz recanted that portion of his deposition testimony in
which he had stated, first, that the lymph node surgery was underway when
he arrived in the operating room and, second, that the frozen section results
were being reported over the intercom as he entered the room. Schwartz
explained that he had been mistaken at his deposition with respect to the
sequence of events and that he subsequently had remembered that Edraki
did not begin the lymph node dissection until after Schwartz arrived and
after the frozen section results had been reported over the intercom. Edraki's
and Casper's trial testimony corroborated Schwartz' trial testimony with
respect to the timing of the lymph node surgery in relation to the announce-
ment of the frozen section results and Schwartz' arrival in the operating
room. In light of the jury's findings that Casper, Schwartz and Edraki all
had breached the standard of care with respect to their management and
treatment of DiLieto, and because we construe the evidence in the light
most favorable to the prevailing party, for purposes of the present case, we
presume that the jury believed Schwartz' deposition testimony regarding

All of the tissue specimens that had been removed during the surgery were sent to the Yale-New Haven Hospital pathology laboratory for permanent section analysis, a postoperative diagnostic procedure that is more thorough than the frozen section analysis. Consistent with the results of the frozen section analysis, the permanent sections revealed no evidence of endometrial stromal sarcoma. On May 12, 1995, nine days after DiLieto's surgery, copies of the postoperative pathology report confirming that no malignancy of any kind had been found in DiLieto's tissue specimens were sent to Casper, Edraki and Schwartz. Even though the report conclusively ruled out cancer, none of those three physicians informed DiLieto of this fact. To the contrary, all three of them repeatedly led her to believe that all of the cancer had been surgically removed and that, as a result, she was cured. Indeed, in the months following the surgery, Casper, Schwartz and Edraki each advised DiLieto that she was not a candidate for hormone replacement therapy to treat the severe symptoms of menopause that she had been experiencing due to the removal of her reproductive organs because, as they explained, estrogen could cause a recurrence of her cancer.

After the surgery, DiLieto experienced unrelenting and excruciating pain in her genitals, bladder and right leg that she had not experienced prior to her surgery. During one of her many postoperative visits to Casper's office, DiLieto informed Casper that it felt as if there were "scissor[s]" inside her, or that someone had "dropped something" there. Casper told her that her symptoms were the result of "profound estrogen deficit" and that she should "get out, go visit people, go shopping" to get her mind off of her pain. In October, 1995, five months after the surgery, DiLieto made an

the sequence of events on the day of the surgery and rejected the trial testimony of Edraki, Casper and Schwartz concerning those events.

appointment to see Casper and confronted him concerning the lack of progress in her recovery. At that time, she told him that she feared there was something seriously wrong with her that was unrelated to menopause. Casper responded that he believed that her problems could be related to the pelvic lymph node dissection that Schwartz had performed. DiLieto informed Casper at that time that she had become aware that Schwartz was not the person who had performed the lymph node portion of her surgery, and that she feared that the physician who had performed it, Edraki, had done something wrong. The meeting ended on a contentious note, and DiLieto did not return to Casper for further treatment.

Following her final meeting with Casper, DiLieto obtained her medical records and pathology slides and arranged to have them reviewed by Robert H. Young, a pathologist at Massachusetts General Hospital in Boston. After reviewing DiLieto's pathology slides, Young concluded that DiLieto never had had uterine cancer but, instead, had been suffering from a benign fibroid, which likely had been extracted during the April, 1995 D & C. Young sent a report of his findings to Yale and to Michael Parker, DiLieto's family physician. On or about February 16, 1996, more than nine months after her surgery, DiLieto learned for the first time that she never had had cancer. DiLieto testified at trial that, if she had known prior to her surgery that her condition could be benign, she would have elected to undergo additional diagnostic testing before agreeing to surgery, and that, if the additional testing had revealed no evidence of cancer, she would have elected to preserve her reproductive organs.

In February, 1997, DiLieto and her husband commenced this action[20] against Casper and County Obstet-

---

[20] As we explained; see footnote 3 of this opinion; Daly, as trustee in bankruptcy, has been substituted as the plaintiff.

rics, and against Yale University School of Medicine as the employer of Edraki, Schwartz and Parkash.[21] In an amended substitute complaint dated November 7, 2005, Daly alleged that Casper had breached the standard of care as a physician specializing in the field of gynecology in failing (1) to inquire of the tumor board with respect to its interpretation of the analysis of the tissue specimens from DiLieto's April, 1995 D & C and, as a result, failed to perform additional diagnostic tests that would have led to reasonable treatment options other than the hysterectomy, bilateral salpingo-oophorectomy and pelvic lymph node dissection, (2) to communicate to Edraki and Schwartz in a timely manner the results of the intraoperative frozen section analysis, which indicated that DiLieto did not have endometrial stromal sarcoma, (3) to inform DiLieto of the content of the final pathology report indicating that she never did have endometrial stromal sarcoma, (4) to ensure that Schwartz participated in DiLieto's pelvic lymph node dissection as promised, and (5) to terminate the surgery and inform DiLieto of the absence of any evi-

---

[21] DiLieto and her husband also named as defendants Anderson, the pathologist who first examined the tissue specimens from the April, 1995 D & C, and Yale-New Haven Hospital. See footnote 2 of this opinion. The action subsequently was withdrawn against Yale-New Haven Hospital. The first trial in this case commenced in the spring of 2000, following which a jury returned a verdict in favor of Anderson and Yale University School of Medicine. *DiLieto* v. *County Obstetrics & Gynecology, P.C.,* 265 Conn. 79, 86, 828 A.2d 31 (2003). The jury, however, was unable to reach a verdict as to Casper and County Obstetrics. Id. The trial court rendered judgment in accordance with the jury verdict, and ordered a new trial with respect to Casper and County Obstetrics. See id., 86–87. Daly appealed from the judgment of the trial court as to Anderson and Yale University School of Medicine. Id., 81–82. On appeal, we affirmed the judgment of the trial court with respect to Anderson but reversed the judgment with respect to Yale University School of Medicine; id., 109; concluding, as to Yale University School of Medicine, that the trial court improperly had excluded the testimony of one of Daly's expert witnesses. Id., 97. We also addressed several issues that were likely to recur at a second trial. See generally id., 97–109. The present appeal arises out of the second trial of this matter.

dence of uterine cancer before subjecting her to the pelvic lymph node dissection.

Daly also alleged that Yale University School of Medicine was vicariously liable for the negligence of its employees, namely, Edraki and Schwartz.[22] With respect to Edraki, Daly alleged, inter alia, that he had breached the standard of care as a physician specializing in the field of gynecologic oncology by failing (1) to communicate with Casper prior to DiLieto's surgery, (2) to obtain the results of the intraoperative frozen section analysis prior to performing the pelvic lymph node dissection, (3) to confirm the diagnosis of endometrial stromal sarcoma before performing the lymph node dissection, (4) to terminate the surgery and to inform DiLieto of the absence of any evidence of cancer before undertaking the lymph node dissection, and (5) to inform DiLieto in a timely manner that she never did have endometrial stromal sarcoma. Daly further alleged that Schwartz had breached the standard of care as a physician specializing in the field of gynecologic oncology by (1) permitting Edraki to perform a pelvic lymph node dissection without first obtaining the results of the intraoperative frozen section analysis, (2) failing to ensure that Edraki consulted with the pathologist who performed the frozen section analysis before performing the pelvic lymph node dissection, (3) failing to ensure that Edraki confirmed the diagnosis of endometrial stromal sarcoma before performing the lymph node dissection, (4) failing to inform DiLieto in a timely manner that she never did have endometrial stromal sar-

---

[22] Daly also alleged that Parkash, as an employee of Yale University School of Medicine, had breached her duty to exercise the degree of care and skill ordinarily exercised by physicians specializing in the field of pathology by inaccurately and improperly analyzing DiLieto's tissue specimens from her April, 1995 D & C as being consistent with endometrial stromal sarcoma. The jury found in favor of Yale University School of Medicine with respect to the allegations against Parkash, and Daly has not challenged that finding on appeal.

coma, (5) failing to terminate DiLieto's surgery prior to the removal of her pelvic lymph nodes, and (6) failing to supervise Edraki during the lymph node dissection. Finally, Daly alleged that, as a result of the breaches of the standard of care by Casper, Edraki and Schwartz, DiLieto had sustained serious bodily injury, including, inter alia, the unnecessary removal of her reproductive organs and pelvic lymph nodes, damage to her genital-femoral nerve or obturator nerve, or both, during the pelvic lymph node dissection, and pain and suffering.

At trial, Daly's counsel called Arthur Dean Cromartie, Jr., a gynecologist, as an expert witness. He testified that Casper had deviated from the standard of care in his treatment of DiLieto in that he had (1) failed to consult the tumor board's findings regarding the results of the analysis of DiLieto's tissue samples and, as a result, failed to learn that two benign conditions had been added to DiLieto's differential diagnosis, (2) allowed Edraki to perform the pelvic lymph node dissection even though the frozen section analysis showed no evidence of endometrial stromal sarcoma, (3) failed to prescribe hormone replacement therapy in an abruptly menopausal woman, and (4) failed to explain to DiLieto after her surgery that she never did have endometrial stromal sarcoma. Cromartie further testified that, if Casper had complied with the standard of care and consulted the tumor board's findings with respect to the results of the analysis of DiLieto's tissue specimens, he would have had two treatment options available to him. The first such option would have been to preserve the uterus but obtain additional tissue samples by performing a second D & C and hysteroscopy, followed by diagnostic imaging studies such as a computed tomography scan (CT scan) or magnetic resonance imaging (MRI). The second option would have been to perform a hysterectomy, that is, to remove the uterus surgically, and to perform a frozen section at

the time of surgery to ascertain whether cancer was present. Cromartie stated that if the second option was elected after consultation with the patient, and the frozen section revealed no evidence of cancer, then, under the applicable standard of care, a pelvic lymph node dissection would not be performed. Cromartie stressed that the decision regarding which treatment to choose always is a "patient-driven process . . . ."

John Henry Shepherd, a gynecologic oncologist, also testified as an expert witness for Daly. He opined that both Edraki and Schwartz had deviated from the standard of care in their treatment of DiLieto in several respects. With respect to Edraki, Shepherd testified that he had breached the standard of care by performing the pelvic lymph node dissection even though there was no evidence of uterine cancer and before the frozen section results were announced. Shepherd explained that, when a frozen section analysis is requested, "it's for a specific reason. There's no point in asking for an intraoperative consultation . . . unless one is going to take notice of . . . the result . . . ." Shepherd further testified that Edraki had breached the standard of care by failing to inform DiLieto that she did not have cancer. With respect to Schwartz, Shepherd testified that it was a breach of the standard of care for Schwartz to permit Edraki to perform the pelvic lymph node dissection even though there was no evidence of uterine cancer and to fail to inform DiLieto after the surgery that she did not have cancer. Finally, Shepherd testified that, if DiLieto actually had been suffering from endometrial stromal sarcoma for approximately twelve to fourteen months, such a condition would have been apparent on any preoperative diagnostic imaging scan of her uterus.

Daly's counsel introduced into evidence the deposition testimony of Moshe Hasbani, a neurologist who treated DiLieto after the surgery for pain and numbness in her right leg, for genital and rectal pain, and for pain

from urination. In his deposition testimony, Hasbani stated that he believed, to a reasonable degree of medical certainty, that DiLieto's symptoms were caused by an injury either to her genital-femoral nerve or to her obturator nerve, most likely the genital-femoral nerve. Although Hasbani stated that he could not be certain which of the nerves was involved, he was certain that it was one or the other. In addition, he believed that the injury had occurred during the surgery and that the injury likely was permanent. Hasbani explained that both the genital-femoral and obturator nerves travel through the area transected during the pelvic lymph node dissection and that the part of the nerve that he believed most likely had been injured was in that area. When Hasbani was asked to explain when during the surgery DiLieto had suffered the nerve injury, he stated: "I can't really be sure of what the exact cause was, whether it was a stretch injury or a clip that was put across it or whether the nerve has been transected during the surgery. I can't really tell you for sure." Hasbani explained that any one of the surgical clips, if it was to come in contact with one of the nerves, could cause the type of pain that DiLieto was experiencing. He also stated that, although it would take just one clip to cause injury to the nerve, the more clips that are placed along the course of the nerve, the more likely it is that an injury will occur.

Finally, Jeffrey Brian Mendel, a radiologist who is board certified in radiology and nuclear medicine, also testified for Daly. Prior to testifying, Mendel had reviewed a CT scan of DiLieto's pelvic area, which was done after her surgery, and counted between thirty and forty surgical clips along the typical course of the genital-femoral and obturator nerves. Mendel testified that, because nerves are comprised of soft tissue and therefore generally are not visible on a CT scan, he could not determine from the scan whether any of the clips

were actually touching the genital-femoral or obturator nerves. He was certain, however, that they were all in close proximity to those nerves.

The defendants presented the testimony of several witnesses, including Casper, Anderson and Parkash. The defendants also introduced the deposition testimony of Martin A. Samuels, a neurologist.

At the conclusion of the trial, the jury returned a verdict in favor of Daly in the amount of $5,200,000, with $2,715,000 apportioned to Casper and County Obstetrics and $2,485,000 apportioned to Yale University School of Medicine.[23] Thereafter, Daly filed a motion for offer of judgment interest[24] and for costs, and the defendants filed motions to set aside the verdict, for judgment notwithstanding the verdict, for a new trial and for remittitur. The court granted Daly's motion for offer of judgment interest and costs and denied the defendants' motions. The court rendered judgment for Daly in the amount of $11,110,045.79, which included $5,886,113.64 in offer of judgment interest and $23,932.15 in costs. These appeals followed. Additional facts and procedural history will be set forth as necessary.

I

We commence our review with the defendants' appeal in Docket No. SC 17744.[25] The defendants first claim that the trial court improperly denied their

---

[23] In response to interrogatories that were submitted to the jury, the jury assigned $1,000,000 of the total amount of the verdict for bodily injury relating to the unnecessary removal of DiLieto's reproductive organs, $3,500,000 for nerve damage related to the unnecessary pelvic lymph node dissection, and $700,000 for mental anguish stemming from the failure to advise DiLieto that she never had endometrial stromal sarcoma.

[24] DiLieto had filed offers of judgment in the amount of $1,499,999.

[25] We address the defendants' appeal in Docket No. SC 17744 in parts I, II and III of this opinion. We address the defendants' cross appeal in Docket No. SC 17471 in part IV of this opinion.

motions to set aside the verdict and for judgment notwithstanding the verdict on the ground of evidentiary insufficiency. Specifically, they contend that the evidence was insufficient to establish that (1) Casper was negligent in removing DiLieto's reproductive organs because the removal of those organs was unwarranted, (2) DiLieto's nerve damage occurred during the pelvic lymph node dissection, and (3) Daly was entitled to damages for DiLieto's nerve damage because Daly had failed to present evidence of DiLieto's life expectancy prior to the close of evidence, and the trial court improperly took judicial notice of a life expectancy table after permitting Daly to open the evidentiary portion of the trial. We reject each of these claims, which we address in turn.[26]

---

[26] Certain, well established legal principles govern our review of the defendants' claims. "The standard for reviewing the denial of motions to set aside the verdict and for judgment notwithstanding the verdict on evidentiary grounds is clear. Our review of the trial court's [decision to deny the motions] requires us to consider the evidence in the light most favorable to the prevailing party, according particular weight to the congruence of the judgment of the trial judge and the jury, who saw the witnesses and heard their testimony. . . . The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached [its] conclusion." (Internal quotation marks omitted.) *Stewart* v. *Cendant Mobility Services Corp.*, 267 Conn. 96, 102, 837 A.2d 736 (2003).

"[P]rofessional negligence or malpractice . . . [is] defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services. . . . Furthermore, malpractice presupposes some improper conduct in the treatment or operative skill [or] . . . the failure to exercise requisite medical skill . . . ." (Internal quotation marks omitted.) *Boone* v. *William W. Backus Hospital*, 272 Conn. 551, 562, 864 A.2d 1 (2005). Therefore, "[t]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury." (Internal quotation marks omitted.) Id., 567.

## A

We first consider Casper's contention that Daly failed to present evidence sufficient to support the jury's finding that Casper was negligent because he removed DiLieto's reproductive organs unnecessarily.[27] This claim is predicated on the testimony of Daly's expert, Cromartie, who testified that the surgical removal of DiLieto's reproductive organs was within the standard of care for the treatment of a patient with DiLieto's differential diagnosis. Casper maintains, therefore, that, even if he had deviated from the standard of care in failing to obtain the results of DiLieto's tissue analysis, the evidence did not support a finding of negligence because the surgical removal of DiLieto's reproductive organs was medically appropriate under the circumstances. In support of this argument, Casper relies primarily on *Wasfi* v. *Chaddha*, 218 Conn. 200, 588 A.2d 204 (1991), in which this court reaffirmed the principle that, when "the treatment or procedure is one of choice among competent physicians, a physician cannot be held [liable for] malpractice in selecting the one which, according to his best judgment, is best suited to the patient's needs." (Internal quotation marks omitted.) Id., 208.

Daly maintains that Casper's reliance on *Wasfi* is misplaced because Casper did not choose, in the exercise of his professional judgment, a medically appropriate treatment over some other medically appropriate treatment. Daly asserts, rather, that Casper breached the standard of care by failing to obtain DiLieto's pathology results; that, because of his negligent failure to obtain those results, he also failed to order certain diagnostic tests that would have revealed that DiLieto did not have cancer; and that, because Casper was unaware of that fact, he had failed to advise DiLieto of treatment

---

[27] County Obstetrics also raises this claim.

alternatives to surgery that DiLieto reasonably would have elected if she had been apprised of them, thereby avoiding the various procedures that resulted in the removal of her reproductive organs and the nerve damage that she had sustained. We agree with Daly.

It is undisputed that Casper failed to obtain from the tumor board its findings regarding the results of the pathology department's analysis of DiLieto's tissue specimens. Daly's expert witness, Cromartie, testified that the applicable standard of care required Casper to obtain those findings and results before performing surgery and, in light of them, to undertake additional diagnostic testing to resolve DiLieto's diagnosis before deciding on a course of treatment. According to Cromartie, the diagnostic tests that could have been utilized included a second D & C and hysteroscopy followed by a CT scan, MRI or ultrasound, or a hysterectomy followed by a frozen section analysis. Cromartie further testified that the decision as to which of the foregoing diagnostic tests to employ always is made in consultation with the patient. In light of Cromartie's testimony, we conclude that the evidence supported the jury's finding that Casper deviated from the standard of care in his treatment of DiLieto.

There also was sufficient evidence from which the jury reasonably found that Casper's negligence caused DiLieto to undergo a hysterectomy, bilateral salpingo-oophorectomy and pelvic lymph node dissection to which she otherwise would not have consented. DiLieto testified that, if she had known that her condition might be benign, she would have agreed to further diagnostic testing to resolve her diagnosis in advance of any surgery and, if those tests had found no evidence of cancer, she would have opted to forgo surgery and to preserve

her reproductive organs.[28] According to Daly's gyneco-logic oncology expert, namely, Shepherd, any of the preoperative imaging tests, including an ultrasound, would have revealed the presence of advanced endometrial stromal sarcoma. Indeed, Casper himself testified that, if he had known that DiLieto was suffering from a benign fibroid tumor, he would have informed her that her medical options included, among other things, doing nothing at all or taking medicine to shrink the tumor, and that, in consultation with DiLieto, he would have considered a different course of treatment.[29] Thus, the testimony of Cromartie, Shepherd, DiLieto and Casper support a finding that, but for Casper's negligent failure to obtain the tumor board's findings with respect to the results of the analysis of DiLieto's tissue specimens, he would have learned that DiLieto may not have

---

[28] At the first trial, the trial court declined to permit DiLieto to testify about what treatment alternative she would have elected if she had been apprised, prior to surgery, that her condition might have been benign and that surgery was only one treatment option among others. See *DiLieto* v. *County Obstetrics & Gynecology, P.C.*, 265 Conn. 79, 105, 828 A.2d 31 (2003). On appeal, we concluded that the trial court improperly had barred this proffered testimony, explaining that "DiLieto's proposed testimony was . . . relevant to the issue of causation. Hearing what course of treatment DiLieto would have pursued had she known that her condition was possibly benign would have been helpful to the jury in evaluating the plaintiff's claim that a failure to communicate the differential diagnosis to DiLieto led, in part, to the performance of unnecessary surgery." Id., 108.

[29] When Daly's counsel asked Casper whether his approach to treatment would have been different if he had known that DiLieto's differential diagnosis contained two benign conditions, one of which was consistent with a fibroid tumor, Casper responded, "Yes." When asked whether he would have shared the information with DiLieto, Casper responded, "Yes." Casper then was asked what he would have told DiLieto if she had asked him what her treatment options were if testing revealed that she had a fibroid tumor. Casper responded: "I would have told her that you could do nothing, you could remove a fibroid by a myomectomy [i.e., surgery], or you can do a hysterectomy, or you can treat it medically with Lupron [a hormone analog] to shrink it down depending on the size, as preoperative therapy." When Daly's counsel asked Casper who makes the decision as to which of the these treatment plans to pursue, Casper responded: "The patient along with me."

had cancer, and, upon so informing DiLieto, who would have opted against surgery, Casper would have pursued a treatment plan that did not include surgery.[30]

B

The defendants next claim that the evidence was insufficient to support the jury's finding that DiLieto's nerve damage occurred during the pelvic lymph node dissection, a fact that Daly was required to prove because he did not allege that any nerve damage had resulted from the hysterectomy or the bilateral salpingo-oophorectomy. In support of this claim, the defendants contend that Hasbani, a neurologist whose deposition testimony was introduced into evidence by Daly, stated that he was unsure whether the nerve injury occurred during the pelvic lymph node dissection, which was performed by Edraki, or the other two procedures,[31] which were performed by Casper. In light of

---

[30] Casper contends that the claim against him is really a claim for lack of informed consent, a claim that was not asserted, and, for that reason, the negligence claim must fail. See *Levesque* v. *Bristol Hospital, Inc.*, 286 Conn. 234, 253, 943 A.2d 430 (2008) ("[u]nlike the traditional action of negligence, a claim for lack of informed consent focuses not on the level of skill exercised in the performance of the procedure itself but on the adequacy of the explanation given by the physician in obtaining the patient's consent" [internal quotation marks omitted]). Casper, however, raises this claim for the first time in his reply brief. "It is well established . . . that [c]laims . . . are unreviewable when raised for the first time in a reply brief. . . . Our practice requires an appellant to raise claims of error in his original brief, so that the issue as framed by him can be fully responded to by the appellee in its brief, and so that we can have the full benefit of that written argument. Although the function of the appellant's reply brief is to respond to the arguments and authority presented in the appellee's brief, that function does not include raising an entirely new claim of error." (Internal quotation marks omitted.) *SS-II, LLC* v. *Bridge Street Associates*, 293 Conn. 287, 302, 977 A.2d 189 (2009). Accordingly, Casper is not entitled to review of this claim. We note, nevertheless, that, although an informed consent claim might have been asserted along with the negligence claims, Casper has provided no persuasive reason why those two claims would be mutually exclusive under the facts of the present case.

[31] As we previously noted, Casper performed the hysterectomy and the bilateral salpingo-oophorectomy.

this testimony, the defendants contend that the jury was left to speculate as to an essential element of Daly's claim. We conclude that the jury reasonably found that DiLieto sustained the nerve damage during the pelvic lymph node dissection.

In support of their claim, the defendants rely primarily on Hasbani's deposition testimony that he could not "tell exactly what part of the surgery actually caused the damage," which was elicited in response to the following question by the defendants' counsel: "Do I understand . . . that you attribute the nerve injury to the surgery, but you can't tell necessarily what portion of the surgery . . . ?" Viewed in isolation, Hasbani's deposition testimony appears to support the defendants' claim. When considered in the context of his other deposition testimony, however, it is likely that Hasbani was referring to the pelvic lymph node dissection when he stated that he was uncertain as to "what part of the surgery" caused DiLieto's nerve damage. In other words, it is likely that Hasbani understood the term "surgery" as referring to the surgical removal of DiLieto's pelvic lymph nodes. This view of Hasbani's deposition testimony finds support in the fact that, on examination by Daly's counsel, Hasbani stated that the nerve that he believed had been injured was in "the area that was transected *during the course of the pelvic lymph node portion of the surgery* . . . ." (Emphasis added.) Moreover, because Hasbani stated that he was uncertain as to whether the nerve damage had been caused when the nerve was stretched, when a clip or clips were placed across it, or when it was transected[32]—all of which occurred or most likely occurred

---

[32] In particular, Hasbani was asked, "Is it still your opinion that the nature of [the] injury to the nerve . . . was a stretch injury?" Hasbani answered: "I can't really be sure of what the exact cause was, whether it was a stretch injury or clip that was put across it, or whether the nerve ha[d] been transected during the surgery."

during the pelvic lymph node dissection—it is reasonable to presume that the uncertainty to which Hasbani was referring pertained to that surgical procedure, and not to any uncertainty as to whether the injury had occurred in connection with the hysterectomy or the bilateral salpingo-oophorectomy, on the one hand, or the pelvic lymph node dissection, on the other.

This view of Hasbani's deposition testimony is consistent with other testimony related to the same issue. As we previously indicated, the evidence established that injury to both the genital-femoral and obturator nerves is a known risk of pelvic lymph node dissection, and the incisions that were made during the lymph node dissection that was performed on DiLieto were much closer to those two nerves than the incisions that had been made during the hysterectomy and the bilateral salpingo-oophorectomy. The jury also was aware that surgical clips were used only during the pelvic lymph node dissection, and that all of them were placed in very close proximity to the genital-femoral and obturator nerves. In fact, according to Daly's radiology expert, Mendel, between thirty and forty of those clips were permanently inserted along the typical course of the two nerves. Moreover, Hasbani stated that, if even one of them came into contact with a nerve, it could cause precisely the type of pain that DiLieto was experiencing in her pelvic region. Hasbani further testified that the more clips that are used during pelvic lymph node surgery, the more likely it is that a nerve injury will occur. This is significant because, when asked how many surgical clips he typically uses when performing a pelvic lymph node dissection, Schwartz, a much more experienced surgeon than Edraki, who was performing his first such surgical procedure without supervision, replied that he usually uses ten or twelve, maybe a few more, which is considerably fewer than the thirty to forty clips that Edraki had used. Considering all of the

relevant evidence in context and in the light most favorable to Daly, we are persuaded that it is sufficient to support a finding that DiLieto's nerve damage was caused during the course of the pelvic lymph node dissection that Edraki had performed.

C

The defendants next claim that the trial court should not have permitted the jury to award damages for DiLieto's permanent nerve damage because Daly failed to adduce evidence of her life expectancy before the close of evidence, and the trial court improperly took judicial notice of a life expectancy table following the close of evidence. The defendants contend that the trial court abused its discretion in taking judicial notice of the life expectancy table following the close of evidence because, in doing so, the court deprived them of notice and an opportunity to challenge the applicability of the table's averages to DiLieto, a former smoker.[33] We conclude that the defendants failed to preserve this claim at trial, and, therefore, we decline to review it.

The following facts and procedural history are necessary to our resolution of this claim. After the parties had completed their closing arguments, the trial court instructed the jury on the law applicable to each of Daly's claims. At the conclusion of the court's instructions, the defendants objected to the portion of the jury charge relating to Daly's claim that DiLieto had suffered permanent nerve damage. They claimed, in particular, that there was no basis for the jury to calculate damages because no life expectancy table had been entered into evidence. The trial court stated that it was unaware that a life expectancy table was not among the 680 trial exhibits. Daly then moved for permission to open the evidentiary portion of the trial for the limited purpose

---

[33] Medical records that were admitted at trial established that DiLieto had stopped smoking in 1994.

of introducing a life expectancy table. The trial court responded that parties frequently stipulate to life expectancy but that it also was an appropriate issue for judicial notice. The court then took a brief recess to retrieve a life expectancy table. When proceedings resumed, the court indicated that it was prepared to open the evidence to take judicial notice of the life expectancy table. At that point, Daly's counsel asked the defendants' counsel if the defendants would be willing to stipulate to DiLieto's life expectancy. The defendants' counsel stated that the defendants were not prepared to do so. The court then granted Daly's motion to open the evidence and took judicial notice of the life expectancy table. Thereafter, the court recalled the jury and instructed it on DiLieto's life expectancy. The court indicated at that time that the defendants "may have an exception to that charge." Aside from their objection to the jury charge on the basis of the lack of an evidentiary foundation, the defendants raised no other claim in opposition to the action of the trial court.

"[A] trial court's determination . . . to take judicial notice is essentially an evidentiary ruling. . . . Our role in reviewing evidentiary rulings of the trial court is settled. The trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) *Drabik* v. *East Lyme*, 234 Conn. 390, 398–99, 662 A.2d 118 (1995). "Our review of evidentiary rulings made by the trial court is limited to the specific legal ground raised in the objection [to the trial court]. . . . This court reviews rulings solely on the ground on which the party's objection is based." (Internal quotation marks omitted.) *Travelers Ins. Co.* v. *Namerow*, 257 Conn. 812, 831, 778 A.2d 168 (2001), superseded in part on other grounds, 261 Conn. 784, 807 A.2d 467 (2002). "[W]e have explained that, to afford petitioners

on appeal an opportunity to raise different theories of objection would amount to ambush of the trial court because, [h]ad specific objections been made at trial, the court would have had the opportunity to alter [the charge] or otherwise respond." (Internal quotation marks omitted.) *State* v. *Johnson*, 288 Conn. 236, 287–88, 951 A.2d 1257 (2008).

We conclude that the defendants failed to preserve their claim that the trial court had deprived them of the opportunity to challenge the applicability of the life expectancy table to a former smoker when the court took judicial notice of that table. Although it is true that the trial court noted the objection of the defendants' counsel after taking judicial notice of the life expectancy table, that objection challenged the propriety of the court's jury charge solely on the ground that that charge was not supported by the evidence. At no time did the defendants raise the claim that they now assert on appeal, namely, that, by taking judicial notice of the life expectancy table, the court improperly was precluding them from challenging the applicability of the table to DiLieto.[34] Because the defendants never raised such a claim, the trial court never was afforded the opportunity to consider it. We therefore decline to address the defendants' claim.[35]

---

[34] The defendants also never sought to present evidence establishing that the life expectancy table was inapposite with respect to a person who, like DiLieto, was a former smoker.

[35] To the extent that the defendants may be deemed to have preserved the claim that the trial court improperly granted the motion to open the evidence for the purpose of taking additional evidence on the issue of life expectancy, the defendants cannot prevail on that claim. "Whether . . . a trial court will permit further evidence to be offered after the close of testimony in the case is a matter resting within its discretion. . . . In the ordinary situation [in which] a trial court feels that, by inadvertence or mistake, there has been a failure to introduce available evidence [on] a material issue in the case of such a nature that in its absence there is serious danger of a miscarriage of justice, it may properly permit that evidence to be introduced at any time before the case has been decided." (Citations omitted; internal quotation marks omitted.) *Bortner* v. *Woodbridge*, 250 Conn. 241, 265, 736 A.2d 104 (1999). In the present case, the court reasonably

## II

The defendants next claim that the trial court instructed the jury on two specifications of negligence, namely, Casper's failure to ensure that Schwartz participated in the pelvic lymph node dissection and Schwartz' failure to supervise Edraki during that surgical procedure, that were not supported by the evidence and, in any event, were time barred.[36] We disagree with both of these claims.[37]

## A

Several well established principles govern our review of the defendants' claim that the trial court should not

determined that Daly's failure to present evidence of life expectancy prior to the close of evidence was inadvertent and that, under the circumstances, it would have been unjust to deny Daly the opportunity to do so thereafter. This is especially true in light of the fact that the defendants did not alert the trial court to any possible prejudice that might arise from the granting of the motion to open. Thus, even if we assume, arguendo, that the defendants' objection to the court's instruction may be construed as preserving the claim that the trial court had abused its discretion in permitting Daly to open the evidentiary portion of the trial, the claim lacks merit.

[36] The defendants also claim that there was insufficient evidence to support a third allegation of negligence, that is, that Casper had deviated from the standard of care in failing to obtain the tumor board's findings with respect to the results of the analysis of DiLieto's tissue specimens. Because we previously determined that the evidence supported the jury's finding that Casper had deviated from the standard of care in failing to obtain the results of the analysis of DiLieto's tissue specimens by the pathology department and the findings of the tumor board with respect to those results, the defendants cannot prevail on this claim.

[37] We reject Daly's contention that we should decline to consider these claims because they are not preserved. We agree with the defendants that their claims were adequately preserved by the objections to the specifications that the defendants had raised in their motions for judgment notwithstanding the verdict and to set aside the verdict. We also reject Daly's assertion that the general verdict rule precludes appellate review of the defendants' claim. In the present case, interrogatories were submitted to the jury, and each count was predicated on no more than one legal theory of recovery. In such circumstances, the general verdict rule does not operate to bar judicial review. See, e.g., *Curry* v. *Burns*, 225 Conn. 782, 786, 626 A.2d 719 (1993) ("[a] party desiring to avoid the effects of the general verdict rule may elicit the specific grounds for the verdict by submitting

have instructed the jury on the two foregoing specifications of negligence because the evidence was insufficient to support them. Of course, the court is required to instruct the jury on "the issues as outlined by the pleadings and as reasonably supported by the evidence." (Internal quotation marks omitted.) *DiStefano* v. *Milardo*, 276 Conn. 416, 421, 886 A.2d 415 (2005). It also is true, however, that "[t]he court has a duty to submit to the jury no issue [on] which the evidence would not reasonably support a finding." (Internal quotation marks omitted.) Id. Furthermore, we may rely on the testimony of the defendants themselves in determining whether Daly has met his burden of establishing both the standard of care to which they may be held and whether they have breached that standard. See, e.g., *Puro* v. *Henry*, 188 Conn. 301, 308, 449 A.2d 176 (1982) ("[t]he defendants themselves, as qualified experts, provided evidence which was clearly sufficient to support a verdict"); *Snyder* v. *Pantaleo*, 143 Conn. 290, 294, 122 A.2d 21 (1956) (jury reasonably could have relied on expert testimony of defendant physician in determining whether plaintiff had established that defendant was negligent). We conclude that it was proper for the trial court to instruct the jury on the two specifications of negligence because the testimony of Schwartz and Casper was sufficient to support a finding by the jury in favor of Daly on each such specification.

At trial, counsel for the defendants asked Schwartz whether Yale's policies permitted Edraki, who then was a first year gynecologic oncology fellow, to perform surgery without supervision. Schwartz responded that, "[e]xcept in emergency situations, the answer is no." When Schwartz was asked what would happen to a gynecologic oncology fellow who performed surgery on a patient outside the presence of his or her supervising physician, he responded that there would be "some

interrogatories to the jury").

significant penalties associated with [such conduct]." When questioned whether Casper would have been qualified to supervise DiLieto's pelvic lymph node dissection, Schwartz responded that Casper would not have been qualified to do so because he "wasn't trained to do that."

The defendants maintain that Schwartz' testimony regarding Yale's policy with respect to the supervision of gynecologic oncology fellows is insufficient to establish the standard of care. In support of this contention, the defendants rely on *Petriello* v. *Kalman*, 215 Conn. 377, 576 A.2d 474 (1990), in which we stated that, "[a]lthough a violation of an employer's work rules can be viewed as evidence of negligence, such a violation does not establish the applicable duty of the hospital to its patients, since hospital rules, regulations and policies do not themselves establish the standard of care." (Internal quotation marks omitted.) Id., 386. *Petriello* does not aid the defendants in the present case because the jury reasonably could have found that Schwartz' testimony went beyond a mere recitation of hospital rules and regulations. Specifically, the testimony was sufficient to support a finding that Schwartz had a professional obligation to ensure that Edraki, who never had performed a pelvic lymph node dissection without supervision, was, in fact, supervised by an attending gynecologic oncologist. Schwartz' testimony also was sufficient to permit a finding that his failure to make provisions for such supervision violated the duty of care that he owed DiLieto to ensure that her pelvic lymph node dissection was performed either by a qualified physician who did not need supervision or by a properly supervised gynecologic oncology fellow. Finally, in light of Schwartz' testimony that Casper was not qualified to supervise the pelvic lymph node dissection due to a lack of training, it also would have been reasonable for the jury to find that Casper breached

his duty of care to DiLieto by permitting Edraki to perform the pelvic lymph node dissection without the proper supervision.

Certain testimony of Casper and Shepherd provided further support for the jury's findings concerning the two challenged specifications of negligence. When Casper was asked how he knew that Edraki did not begin the surgery before Schwartz was present in the operating room, Casper responded, "I know because . . . Edraki would not have started the lymph node dissection without . . . Schwartz there, *and I wouldn't have allowed it* . . . ." (Emphasis added.) We conclude that Casper's insistence that he would not have allowed Edraki to begin the pelvic lymph node dissection without Schwartz being present gave rise to two reasonable inferences, first, that Edraki was not qualified to perform that surgery alone and, second, that Casper had a duty to ensure that someone who *was* qualified to perform a pelvic lymph node dissection was present for that surgery. Finally, Shepherd's testimony provided additional evidence of the standard of care. When Shepherd was asked how Schwartz had deviated from the standard of care, he responded: "Schwartz was . . . Edraki's supervisor and therefore . . . he should not have authorized or allowed . . . Edraki to proceed with the pelvic lymph node dissection surgery in the absence of cancer being present in the uterus." We conclude that, if Schwartz had a duty to ensure that Edraki did not proceed with the surgery in the absence of cancer, then the jury reasonably could have found that Schwartz had a duty to supervise the surgery. In light of the foregoing testimony of Schwartz, Casper and Shepherd, we agree with Daly that the evidence was sufficient to support the two challenged specifications of negligence.

## B

We next address the defendants' claim that these two specifications of negligence were time barred. According to the defendants, the specifications are barred by the applicable statute of limitations, General Statutes § 52-584,[38] because the complaint was not amended to include these allegations until July 2, 1998, after the limitation period had expired. We also disagree with this claim.

The following procedural history is relevant to our resolution of this claim. The defendants filed motions for judgment notwithstanding the verdict and to set aside the verdict on several grounds, including the ground that the two challenged specifications of negligence were not added to the complaint until after the expiration of the statute of limitations and did not relate back to any timely filed complaint because they alleged an entirely new fact pattern and theory of liability. The trial court rejected this claim, explaining, first, that, although DiLieto had undergone surgery on May 3, 1995, she did not learn of her misdiagnosis until February 16, 1996, and, therefore, the statute of limitations did not begin to run until that time. The court then examined the allegations in all of the timely filed complaints and concluded that the two challenged specifications of negligence related back to the complaint dated September 11, 1997, which had been filed within the limitation period.[39]

---

[38] General Statutes § 52-584 provides in relevant part: "No action to recover damages for injury to the person . . . caused by negligence . . . or by malpractice of a physician, surgeon . . . [or] hospital . . . shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of, except that a counterclaim may be interposed in any such action any time before the pleadings in such action are finally closed."

[39] We note that the two challenged specifications of negligence were added to the complaint after Daly learned, during the course of discovery, that

"Under our case law, it is well settled that a party properly may amplify or expand what has already been alleged in support of a cause of action, provided the identity of the cause of action remains substantially the same. . . . If a new cause of action is alleged in an amended complaint . . . it will [speak] as of the date when it was filed. . . . A cause of action is that single group of facts which is claimed to have brought about an unlawful injury to the plaintiff and which entitles the plaintiff to relief. . . . A change in, or an addition to, a ground of negligence or an act of negligence arising out of the single group of facts which was originally claimed to have brought about the unlawful injury to the plaintiff does not change the cause of action. . . . It is proper to amplify or expand what has already been alleged in support of a cause of action, provided the identity of the cause of action remains substantially the same, but [when] an entirely new and different factual situation is presented, a new and different cause of action is stated." (Internal quotation marks omitted.) *Dimmock* v. *Lawrence & Memorial Hospital, Inc.*, 286 Conn. 789, 798, 945 A.2d 955 (2008).

"When comparing [later] pleadings [to timely filed pleadings to determine whether the former relate back to the latter], we are mindful that, [i]n Connecticut, we long have eschewed the notion that pleadings should be read in a hypertechnical manner. Rather, [t]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . [T]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory [on] which it proceeded, and do substantial justice between the parties. . . . Our reading of pleadings in a manner that advances substantial justice means that a pleading must be construed reasonably, to contain all that it fairly

---

Schwartz had not been present for the pelvic lymph node dissection.

means, but carries with it the related proposition that it must not be contorted in such a way so as to strain the bounds of rational comprehension." (Internal quotation marks omitted.) Id., 802.

Because Daly does not dispute that the two challenged specifications were added to the complaint after the limitation period had expired, we must determine whether the specifications relate back to the September 11, 1997 complaint,[40] as the trial court had found. We begin our analysis, therefore, with an examination of that complaint. Count one of the complaint sets forth all of the factual allegations in support of Daly's negligence claim against Casper and County Obstetrics. Paragraph fourteen of count one alleged in relevant part: "Between April 5, 1995, and May 10, 1995 . . . Casper . . . breached [his] duty by failing to exercise that degree of care and skill ordinarily and customarily used by physicians specializing in the field of gynecology and [gynecologic] surgery under the existing circumstances at that time as follows:

"a. Failed to confirm the provisional pathology diagnosis of endometrial stromal sarcoma issued by . . . Anderson, by available diagnostic studies, tests and procedures, prior to removing . . . DiLieto's uterus, fallopian tubes and ovaries.

"b. Failed to timely communicate to . . . Edraki and Schwartz . . . the intraoperative frozen section diagnosis which indicated that . . . DiLieto did not have endometrial stromal sarcoma.

\* \* \*

"d. Failed to confirm that the [t]umor [b]oard . . . had reviewed all the necessary information prior to

---

[40] We note that Daly was not a party to this action when the September 11, 1997 complaint was filed. Rather, DiLieto and her husband were the plaintiffs at that time. In the interest of simplicity, we refer to the claims alleged in the September 11, 1997 complaint as those of Daly's.

[Casper's] performance of the hysterectomy and bilateral salpingo-oophorectomy. . . ."

Construing the complaint with reasonable liberality, we conclude that the allegation that Casper had breached the standard of care in failing to ensure that Schwartz would participate in DiLieto's surgery relates back to the allegations contained in subparagraph (b) of paragraph fourteen of the September 11, 1997 complaint, namely, that Casper had failed to communicate in a timely manner the results of the intraoperative frozen section analysis to Schwartz. As we previously explained, Daly's theory of negligence with respect to Casper was that he negligently had caused DiLieto to undergo three unnecessary procedures, that is, a hysterectomy, a bilateral salpingo-oophorectomy and a pelvic lymph node dissection. The September 11, 1997 complaint alleged that Casper had breached the standard of care by failing to obtain from the tumor board its findings concerning the results of the analysis of DiLieto's tissue specimens and by failing to communicate the intraoperative frozen section results to Schwartz, who was to perform the pelvic lymph node dissection. It stands to reason that, if, as alleged, Casper owed a duty to communicate the frozen section results to Schwartz in a timely manner, then he also had a duty to ensure that Schwartz participated in the surgery. Thus, the allegation that Casper had failed to ensure that Schwartz participated in DiLieto's surgery arose out of, and thus related back to, the allegations in the September 11, 1997 complaint.

We reach the same conclusion with respect to the second specification, that is, that Schwartz had breached the standard of care in failing to supervise Edraki during DiLieto's pelvic lymph node dissection. Count five of the September 11, 1997 complaint set forth all of the factual allegations against Schwartz. Paragraph fourteen of that count alleged in relevant

part: "On or about April 17, 1995, through May 10, 1995 . . . Schwartz . . . undertook the duty to render gynecology and oncology services for the benefit of . . . DiLieto. During said time period . . . Schwartz . . . failed to exercise that degree of care and skill ordinarily and customarily used by physicians specializing in the field of gynecology and oncology under the existing circumstances at that time as follows:

"a. Permitted . . . Edraki, over whom [Schwartz] exercised authority and control, to perform [on] . . . DiLieto . . . a bilateral pelvic lymphadenectomy without . . . Schwartz, consulting with the pathologist who performed the intraoperative frozen section analysis of . . . DiLieto's uterine tissue specimen . . . .

"b. Failed to ensure that . . . Edraki, over whom [Schwartz] exercised authority and control, consult with the pathologist who performed the intraoperative frozen section analysis of . . . DiLieto's uterine tissue specimen prior to . . . [Edraki's] performing [of] the bilateral pelvic lymphadenectomy.

"c. Failed to ensure that . . . Edraki, over whom [Schwartz] exercised authority and control, confirm the diagnosis of endometrial stromal sarcoma before he was permitted to perform a bilateral pelvic lymphadenectomy [on] . . . DiLieto. . . ."

It is evident that the specification that Schwartz breached the standard of care in failing to supervise Edraki relates back to the allegations contained in count five of the September 11, 1997 complaint because all of them, in one form or another, alleged a failure by Schwartz to supervise Edraki during critical moments of DiLieto's pelvic lymph node dissection. Indeed, this second specification of negligence added nothing new to the September 11, 1997 complaint and certainly did not, as the defendants claim, allege an entirely different fact pattern and theory of negligence.

## III

The defendants next claim that the trial court improperly awarded Daly $5,886,113.64 in offer of judgment interest under § 52-192a. In support of this contention, the defendants maintain that the offers of judgment were invalid because DiLieto did not file them until after she had filed for bankruptcy, at which time only Daly, as the trustee in bankruptcy, had the authority to settle the action in accordance with the provisions of § 52-192a. The defendants contend that the offers of judgment were invalid and unenforceable and, further, that the trial court improperly concluded that the substitution of Daly as the plaintiff pursuant to General Statutes § 52-109[41] and Practice Book § 9-20[42] retroactively validated the offers of judgment. They contend that, although substitution of a plaintiff under § 52-109 relates back to the original pleadings for the purpose of tolling any applicable statute of limitations, thereby permitting an action to proceed, it should not be interpreted as retroactively validating or reviving an invalid offer of judgment.

Daly contends that the trial court properly determined that his substitution as the plaintiff related back to the offers of judgment that DiLieto had filed. He maintains that, under long-standing precedent of this court interpreting § 52-109, the substitution of the real party in interest relates back to "all things done in the case by or in favor of the original plaintiff . . . [which] remain for the benefit of the plaintiff who succeeds him, as if done by and for him originally and just as if

---

[41] General Statutes § 52-109 provides: "When any action has been commenced in the name of the wrong person as plaintiff, the court may, if satisfied that it was so commenced through mistake, and that it is necessary for the determination of the real matter in dispute so to do, allow any other person to be substituted or added as plaintiff."

[42] Practice Book § 9-20 is identical to General Statutes § 52-109 in all material respects. See footnote 41 of this opinion.

no change of parties had been made." *Bowen* v. *National Life Assn.*, 63 Conn. 460, 476, 27 A. 1059 (1893). Daly further asserts that the defendants made a strategic decision to reject DiLieto's reasonable offers of judgment that was wholly unrelated to DiLieto's lack of standing to settle the case. He maintains, moreover, that the evidence demonstrates that, if the defendants had accepted the offers of judgment that DiLieto has filed, he, as trustee of DiLieto's bankruptcy estate, would have been required as a matter of law to approve them because the amount of the proposed settlement vastly exceeded the amount of money still owed to DiLieto's creditors. Thus, Daly contends, the defendants cannot claim, under the facts of this case, that they were prejudiced in any way by DiLieto's lack of standing to file the offers of judgment, and, consequently, it would be inconsistent with the purpose of § 52-192a to reward them for their rejection of those offers.

We agree with the defendants that retroactively validating offers of judgment that were incapable of serving to settle the action at the time they were made is inconsistent with the principle that only valid offers of judgment are enforceable. We agree with Daly, however, that the overarching policies underlying §§ 52-192a and 52-109 would be thwarted if the defendants in the present case were relieved altogether of their obligation to pay offer of judgment interest. Thus, in the interest of reconciling and effectuating the policies of *both* §§ 52-192a and 52-109, we conclude, for the reasons set forth more fully hereinafter, that, under the circumstances of this case, the substitution of Daly as the plaintiff operated to validate the offers of judgment on file from the date of the substitution. As a consequence, the defendants are required to pay offer of judgment interest only from that date forward.

The following additional facts and procedural history are necessary to our resolution of this issue. On March

20, 1996, DiLieto and her husband filed a petition in the United States Bankruptcy Court for the District of Connecticut seeking protection under chapter 7 of the United States Bankruptcy Code. See 11 U.S.C. § 701 et seq. (1994). On July 9, 1996, they received a letter from that court informing them that all of their scheduled debts had been discharged. DiLieto filed the present action on February 7, 1997, and, thereafter, on June 5, 1998, DiLieto filed offers of judgment as to each defendant in the amount of $1,499,999. None of the defendants accepted the offers, and, as a consequence, pursuant to the provisions of § 52-192a, those offers were deemed rejected thirty days after their tender. Sometime later, the defendants learned of DiLieto's bankruptcy, and, on March 9, 1999, they filed a motion to dismiss the action on the ground that DiLieto lacked standing to bring the action because her claims were assets of her bankruptcy estate. On March 31, 1999, DiLieto and Daly, as trustee of the estate, filed motions to substitute Daly as the plaintiff. In an affidavit in support of his motion to substitute himself as the plaintiff, Daly stated: "DiLieto has an interest in the referenced lawsuit since the anticipated recovery from the successful prosecution of the referenced lawsuit will substantially exceed any interest of the bankruptcy estate in the potential recovery. I estimate the aggregate amount of all claims, unsecured and administrative, in the DiLieto [bankruptcy] [c]ase to be approximately $37,200. Under the Bankruptcy Code . . . DiLieto is entitled to receive all monies in excess of allowed claims as finally determined by the United States Bankruptcy Court."

On January 27, 2000, the trial court granted the motions for substitution and denied the defendants' motion to dismiss. In doing so, the court noted that DiLieto had conceded, "as she must, that the present cause of action belongs to her bankruptcy estate

because the trustee has not abandoned it, instead, wishing to pursue it with the assistance of [DiLieto's] lawyers." The court further noted that, under § 52-109, "[w]hen any action has been commenced in the name of the wrong person as plaintiff, the court may, if satisfied that it was so commenced through mistake, and that it is necessary for the determination of the real matter in dispute so to do, allow any other person to be substituted or added as plaintiff." (Internal quotation marks omitted.) The court then determined that DiLieto had commenced the action in her own name purely by mistake, stating that her "claim that she had no knowledge of the inappropriateness of naming herself as [a] plaintiff when she commenced the [present action] is well founded. She was led to take that action by an honest mistake—made in good faith and without negligence on her part—that her bankruptcy was over when her scheduled debts were discharged."

On December 7, 2005, after the jury had returned its verdict in the amount of $5,200,000, Daly filed a motion for offer of judgment interest. The defendants thereafter filed an objection to the motion on the ground that DiLieto did not have standing to settle the action when she filed the offers of judgment, and, therefore, the offers were invalid and unenforceable.[43]

The trial court rejected the defendants' claim and granted Daly's motion. In support of its decision, the court explained that the trustee in bankruptcy steps into the shoes of the debtor for the purpose of maintaining the debtor's causes of action. The court further explained that the substitution of a real party in interest under § 52-109 cures any jurisdictional defect in the action resulting from the original plaintiff's lack of standing. The court concluded, in light of these princi-

---

[43] The defendants do not otherwise challenge the propriety or amount of the trial court's award under § 52-192a.

ples, that the substitution of Daly as the plaintiff cured any defect in the offers of judgment. Finally, the trial court observed that, in *Maulucci* v. *St. Francis Hospital & Medical Center Foundation, Inc.*, Superior Court, judicial district of Hartford-New Britain at New Britain, Docket No. 510685 (June 17, 1996) (*Blue, J.*) (17 Conn. L. Rptr. 75, 76), the court "ruled that the substitution of a party defendant did relate back to a previous offer of judgment. Judge Blue noted that, '[g]iven the remedial purpose of the statute, the motion [for prejudgment interest] should not be defeated by a purely technical error . . . .' He further opined that '[t]he plaintiff's offer of judgment was designed to encourage an early, fair, and reasonable settlement. That offer was not accepted. The purpose of the statute would thus be satisfied by an award of prejudgment interest.' . . .

"As in the *Maulucci* case, the defendants [in the present case] 'made a strategic decision not to [accept the offers]. That was [their] right. They must now bear the statutory consequence[s].' "

The resolution of the defendants' claim, which presents an issue of first impression for this court, requires us to interpret two statutes with divergent objectives, one of which is highly remedial and the other of which is punitive in nature. "Well settled principles of statutory interpretation govern our review. . . . Because statutory interpretation is a question of law, our review is de novo." (Citations omitted; internal quotation marks omitted.) *Achillion Pharmaceuticals, Inc.* v. *Law*, 291 Conn. 525, 531, 970 A.2d 57 (2009). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes

§ 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) Id. "When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Key Air, Inc.* v. *Commissioner of Revenue Services*, 294 Conn. 225, 233, 983 A.2d 1 (2009).

In cases "in which more than one [statutory provision] is involved, we presume that the legislature intended [those provisions] to be read together to create a harmonious body of law . . . and we construe the [provisions], if possible, to avoid conflict between them." (Internal quotation marks omitted.) *Gipson* v. *Commissioner of Correction*, 257 Conn. 632, 651, 778 A.2d 121 (2001). Furthermore, it is well established that remedial statutes such as § 52-109 "must be liberally construed in favor of those whom the legislature intended to benefit." (Internal quotation marks omitted.) *Andover Ltd. Partnership I* v. *Board of Tax Review*, 232 Conn. 392, 396, 655 A.2d 759 (1995). In contrast, "[b]ecause § 52-192a is punitive, we are required to construe *it* with reasonable strictness in determining whether the act complained of comes within the description in the statute of the acts for which the person in fault is made liable." (Emphasis

added; internal quotation marks omitted.) *Branford* v. *Santa Barbara*, 294 Conn. 803, 814, 988 A.2d 221 (2010). In light of the ambiguity in § 52-192a with respect to whether the substitution of a plaintiff under § 52-109 relates back to offers of judgment on file such as to render them retroactively valid and enforceable, "we must interpret [§ 52-192a reasonably strictly and] in favor of the party who would be subject to the punitive consequences of the statute rather than in favor of the party who would benefit from those consequences." Id., 814–15.

We begin our analysis with the language of General Statutes § 52-109, which provides: "When any action has been commenced in the name of the wrong person as plaintiff, the court may, if satisfied that it was so commenced through mistake, and that it is necessary for the determination of the real matter in dispute so to do, allow any other person to be substituted or added as plaintiff." As the defendants acknowledge, "[o]ur rules of practice . . . permit the substitution of parties as the interests of justice require. . . . These rules are to be construed so as to alter the harsh and inefficient result that attached to the mispleading of parties at common law. See *Hagearty* v. *Ryan*, [123 Conn. 372, 375–76, 195 A. 730 (1937)]. . . . General Statutes § 52-109 and [what is now] Practice Book § [9-20] allow a substituted plaintiff to enter a case [w]hen any action has been commenced in the name of the wrong person as plaintiff . . . . Both rules, of necessity, relate back to and correct, retroactively, any defect in a prior pleading concerning the identity of the real party in interest. In the context of analogous rules of federal civil procedure, it has been observed that [when] the change is made on the plaintiff's side to supply an indispensable party or to correct a mistake in ascertaining the real party in interest, in order to pursue effectively the original claim, the defendant will rarely be unfairly preju-

diced by letting the amendment relate back to the original pleading. F. James & G. Hazard, Civil Procedure (2d Ed. 1977) § 5.7, pp. 167–68. As long as [the] defendant is fully apprised of a claim arising from specified conduct and has prepared to defend the action, his ability to protect himself will not be prejudicially affected if a new plaintiff is added . . . . Thus, an amendment substituting a new plaintiff [will] relate back if the added plaintiff is the real party in interest. 6A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure [1990] § 1501, pp. [154–55, 157]; see also *Health Research Group* v. *Kennedy*, 82 F.R.D. 21 [30] (D.D.C. 1979) (substitution of real party in interest as plaintiff permitted to cure lack of standing of original plaintiff)." (Citations omitted; internal quotation marks omitted.) *Federal Deposit Ins. Corp.* v. *Retirement Management Group, Inc.*, 31 Conn. App. 80, 84–85, 623 A.2d 517, cert. denied, 226 Conn. 908, 625 A.2d 1378 (1993).

"[R]emedial statutes such as [§ 52-109] were intended to soften the otherwise harsh consequences of strict construction under the common law: Over-technical formal requirements have ever been a problem of the common law, leading [legislative bodies] at periodic intervals to enact statutes . . . [that], in substance, told the courts to be reasonable in their search for technical perfection." (Internal quotation marks omitted.) *Andover Ltd. Partnership I* v. *Board of Tax Review*, supra, 232 Conn. 399–400. Under § 52-109, substitution is permitted only when the trial court determines that the action was commenced in the name of the wrong plaintiff "through mistake," which properly has been interpreted to mean "an honest conviction, entertained in good faith and not resulting from the plaintiff's own negligence that she is the proper person to commence the [action]." *Wilson ex rel. Wilson* v. *Zemba*, Superior Court, judicial district of New Haven,

Docket No. CV-03-0484071-S (November 16, 2004) (*Corradino, J.*) (38 Conn. L. Rptr. 272, 274). This court has stated that, once such a determination is made, as it was in the present case, the substituted party "is let in to carry on a pending suit, and is not regarded as commencing a new one. After he is substituted he is . . . treated and regarded for most purposes just as if he had commenced the suit originally. The writ, the complaint, the service of process, attachment made, bonds given, the entry of the case in court, the pleadings if need be, in short all things done in the case by or in favor of the original plaintiff . . . remain for the benefit of the plaintiff who succeeds him, as if done by and for him originally and just as if no change of parties had been made. So far as the defendant is concerned, the same suit upon the same cause of action, under the same complaint and pleadings substantially in most cases, goes forward to its final and legitimate conclusion as if no change had been made. This power of substitution is part of the law of procedure, and was the law of the state when this policy was issued. It was the right to prosecute a suit in the ordinary way. Under this law the defendant knew that substitution might be made at any proper time during the pendency of the suit." *Bowen* v. *National Life Assn.*, supra, 63 Conn. 476–77. The foregoing principles, which the trial court relied on in concluding that the substitution of Daly related back to the offers of judgment on file, support the trial court's award of offer of judgment interest under the circumstances of this case.

Construing § 52-192a reasonably strictly, however, and mindful of the contractual principles underlying it, we conclude that the defendants' position also is not without merit. "[This court has] consistently held that . . . interest [under § 52-192a] is to be awarded by the trial court when a *valid* offer of judgment is filed by the plaintiff, the offer is rejected by the defendant, and

the plaintiff ultimately recovers an amount greater than the offer of judgment after trial. . . . Moreover, an award of interest under § 52-192a is mandatory, and the application of § 52-192a does not depend on an analysis of the underlying circumstances of the case or a determination of the facts. . . . The statute is admittedly punitive in nature. . . . It is the punitive aspect of the statute that effectuates the underlying purpose of the statute and provides the impetus to settle cases." (Emphasis added; internal quotation marks omitted.) *Accettullo* v. *Worcester Ins. Co.*, 256 Conn. 667, 672, 775 A.2d 943 (2001).

"The purpose of § 52-192a is to encourage pretrial settlements and, consequently, to conserve judicial resources. . . . [T]he strong public policy favoring the pretrial resolution of disputes . . . is substantially furthered by encouraging defendants to accept reasonable offers of judgment. . . . Section 52-192a encourages fair and reasonable compromise between litigants by penalizing a party that fails to accept a reasonable offer of settlement. . . . In other words, interest awarded under § 52-192a is solely related to a defendant's rejection of an advantageous offer to settle before trial and his subsequent waste of judicial resources. . . . Of course, the partial settlement of a case does little for the conservation of our limited judicial resources. Accordingly, the ultimate goal in a multiparty lawsuit is the fair and reasonable settlement of the case on a global basis." (Internal quotation marks omitted.) *Cardenas* v. *Mixcus*, 264 Conn. 314, 321, 823 A.2d 321 (2003).

General principles of contract law apply to the issue of whether an offer of judgment was valid at the time of its tender. We previously have stated that "the acceptance [of an offer of judgment made pursuant to § 52-192a] constitutes an agreement 'to a stipulation for judgment' "; *Gionfriddo* v. *Avis Rent A Car System, Inc.*,

192 Conn. 301, 305, 472 A.2d 316 (1984), overruled in part on other grounds by *Matthiessen* v. *Vanech*, 266 Conn. 822, 836 A.2d 394 (2003); and "[a] stipulated judgment . . . may be defined as a contract . . . ." (Internal quotation marks omitted.) *Ahmadi* v. *Ahmadi*, 294 Conn. 384, 389–90, 985 A.2d 319 (2009); see also *Connecticut Light & Power Co.* v. *Gilmore*, 289 Conn. 88, 133, 956 A.2d 1145 (2008) (*Blue, J.*, concurring and dissenting) ("[t]o decide whether there has been a valid offer of judgment, courts apply the principles of contract law"). Our law recognizes that performance of a contract is excused when the thing to be done becomes impossible. See, e.g., *West Haven Sound Development Corp.* v. *West Haven*, 201 Conn. 305, 313, 514 A.2d 734 (1986); *Straus* v. *Kazemekas*, 100 Conn. 581, 588, 124 A. 234 (1924); see also 2 Restatement (Second), Contracts § 266 (1) (1981) (no duty to render performance arises when, "at the time a contract is made, a party's performance under it is impracticable without his fault because of a fact of which he has no reason to know"). On the basis of these principles, it is quite clear that DiLieto's offers of judgment were invalid at the time she tendered them because, as the trial court found, the cause of action belonged to her bankruptcy estate. Thus, if the defendants had attempted to accept the offers within thirty days, in the normal course, they would not have been binding on Daly, and, consequently, they would not necessarily have served to settle the action.

The issue we must decide, therefore, is what effect, if any, the substitution of Daly as the plaintiff had on the offers of judgment. We are persuaded that, under the facts of this case, the substitution of Daly operated to validate the offers of judgment from the date of substitution such that interest under § 52-192a began to accrue on that date. We reach this conclusion on the basis of analogous case law and in consideration of the

principles underlying §§ 52-109 and 52-192a, which, like the contract principles on which the defendants rely, animate both statutes. Indeed, it is our duty to reconcile these seemingly divergent principles into a coherent scheme.

Our conclusion is supported by *Ceci Bros., Inc.* v. *Five Twenty-One Corp.*, 81 Conn. App. 419, 434, 840 A.2d 578 (*Ceci Bros.*), cert. denied, 268 Conn. 922, 846 A.2d 881 (2004), in which the Appellate Court determined that an offer of judgment that was incapable of being accepted within thirty days of its tender as required under § 52-192a nevertheless could form the basis of an award of interest. In *Ceci Bros.*, the plaintiff, a landscaping services company, brought an action against the defendant pursuant to General Statutes § 49-33, seeking foreclosure of a mechanic's lien, and, thereafter, filed an offer of judgment. See id., 423. The plaintiff subsequently requested leave to amend its complaint to add counts for breach of contract and quantum meruit. Id. The defendant then applied for a discharge of the mechanic's lien, which the trial court denied. Id. That ruling subsequently was reversed by the Appellate Court on the ground that landscape services are not lienable. See *Ceci Bros., Inc.* v. *Five Twenty-One Corp.*, 51 Conn. App. 773, 776, 724 A.2d 541 (1999). Thereafter, the defendant filed a motion to dismiss the remaining counts of the complaint on the ground that they had been added to the complaint after the defendant filed the application for discharge of the mechanic's lien, and, therefore, the trial court was without jurisdiction to consider them. See *Ceci Bros., Inc.* v. *Five Twenty-One Corp.*, supra, 81 Conn. App. 424. The trial court denied the motion, and findings were made with respect to the remaining counts of the amended complaint in favor of the plaintiff in an amount in excess of the offer of judgment. See id. The court thereafter awarded the plaintiff offer of judgment interest "running from the

date of the filing of the amended complaint . . . ." Id. The court reasoned that, in light of the fact that the offer of judgment could not have served to settle the foreclosure action at the time it was filed because the court did not have jurisdiction over that action, "the most equitable and logical time for offer of judgment interest to accrue would be from the date of the amended complaint . . . ." (Internal quotation marks omitted.) Id., 434.

In *Ceci Bros.*, the defendant claimed that the trial court improperly had awarded the plaintiff offer of judgment interest because the offer of judgment was void at the time of its tender, and, therefore, "the defendant could not accept or reject the offer of judgment within thirty days as required by § 52-192a." Id., 431. "Both parties agreed that the complaint was amended to include a breach of contract claim after the defendant's thirty day statutory window to accept the offer of judgment had passed." Id. The defendant further claimed that the offer of judgment "should not apply to the amended complaint at all"; id., 432; and that the starting date for § 52-192a interest to accrue was "illogical and unfair . . . ." Id., 434. In rejecting the defendant's claims, the Appellate Court reasoned that "[t]he plaintiff could not have known at the time it sought foreclosure of its mechanic's lien that the Appellate Court would determine that a mechanic's lien [under § 49-33] could not be used in cases involving landscaping services." Id., 432. It further reasoned that, as a general matter, an offer of judgment applies to "all claims, known and unknown, certain and uncertain" at the time of its filing. Id., 433. The court concluded, therefore, that, "even if . . . the filing of the offer of judgment was premature because the plaintiff's complaint had not yet been amended, the offer of judgment did not become void. . . . [W]hen the amendment occurred, the offer became valid, and the plaintiff did not need to file

another offer of judgment." Id., 434. Specifically, the court stated that the offer of judgment "remained dormant until the amended complaint superseded the original complaint." Id., 435. Thus, the Appellate Court concluded that it was fair and reasonable for the trial court to conclude that offer of judgment interest began to accrue on the date that the plaintiff filed the amended complaint because that was the first time that the offer was capable of serving to settle the action. See id., 434–35.

We conclude that the reasoning that the Appellate Court employed in *Ceci Bros.* also should apply in the present case, namely, that the substitution of Daly as the plaintiff validated the previously filed offers of judgment such that interest began to accrue as of the date of the substitution. In light of the foregoing contractual principles, it would be incompatible with § 52-192a to require the defendants to pay offer of judgment interest prior to that date because the offers of judgment could not have served to terminate the action, the key purpose of § 52-192a.[44] It likewise would be inconsistent with § 52-109, and therefore unfair to Daly, to deprive him of all offer of judgment interest solely on the basis of

[44] We are not persuaded by Daly's assertion that he is entitled to the full amount of interest that the trial court had awarded under § 52-192a because, in the present case, DiLieto's offers of judgment would have served to terminate the action if the defendants had accepted them. Specifically, Daly contends that, as trustee of DiLieto's bankruptcy estate, he would have been legally obligated to approve DiLieto's offers of judgment because the settlement amount ($1,499,999) vastly exceeded the amount (approximately $37,200) that still was owed to DiLieto's creditors. See 11 U.S.C. § 726 (a) (1994) (property of bankruptcy estate shall be distributed in payment of claims against estate with remainder distributed to debtor). As we previously explained, however, the fact remains that DiLieto's offers of judgment were *not* susceptible of being accepted when DiLieto made them, and, therefore, they were not capable of serving to settle the action, which is their sole purpose. Accordingly, we are persuaded that it is incompatible with the principles of § 52-192a to allow interest to accrue before such time as the proper plaintiff is made a party to the action.

DiLieto's mistake in pursuing the action as the original plaintiff. Indeed, the enforcement of the offers of judgment in the present case results in no actual prejudice to the defendants because, as the trial court found, they had rejected DiLieto's offers of judgment for reasons wholly unrelated to her standing to settle the action. Inherent in the legislature's adoption of § 52-109 was the recognition that substitution of the real plaintiff in interest works no hardship on a defendant, who is left in the very same position that he or she occupied prior to the substitution. Indeed, when a plaintiff is added to the case to correct a mistake in ascertaining the real plaintiff in interest, the defendant rarely, if ever, will be prejudiced, as long as he was fully apprised of the claims against him and was prepared to defend against them. See, e.g., *Federal Deposit Ins. Corp.* v. *Retirement Management Group, Inc.*, supra, 31 Conn. App. 84–85.

This is true in the present case because the defendants, who rejected reasonable offers of judgment in favor of costly and protracted litigation, make no claim that they would have done anything differently in defending the action if it had been commenced by Daly and not DiLieto, including reconsidering their decision to reject the offers of judgment.[45] Rather, on appeal, they simply hope to capitalize on the fact that DiLieto did not understand that Daly was the proper party to bring her claims against them.[46] Under the circum-

---

[45] Indeed, after Daly was substituted as the plaintiff, the defendants themselves could have filed an offer of judgment at any time prior to the commencement of trial for the purpose of settling Daly's claims against them, thereby avoiding the imposition of interest against them under § 52-192a. See General Statutes (Rev. to 1997) § 52-193 ("[i]n any action . . . seeking the recovery of money damages, whether or not other relief is sought, the defendant may before trial file with the clerk of the court a written notice signed by him or his attorney, directed to the plaintiff or his attorney, offering to allow the plaintiff to take judgment for the sum named in such notice").

[46] We note that *Cardenas* v. *Mixcus*, supra, 264 Conn. 325–26, supports the view that application of the principles embodied in § 52-192a does not turn on whether, under some set of *hypothetical facts*, a defendant could have been prejudiced by his rejection of an invalid offer of judgment.

stances, therefore, interpreting §§ 52-109 and 52-192a to relieve the defendants altogether of their obligation to pay offer of judgment interest would result in a windfall for them and, at the same time, unfairly penalize Daly, in contravention of both the punitive purposes of § 52-192a; see, e.g., *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 56, 717 A.2d 77 (1998) ("interest awarded under § 52-192a is solely related to a defendant's rejection of an advantageous offer to settle before trial and his subsequent waste of judicial resources" [internal quotation marks omitted]); and the remedial purposes of § 52-109. See *Bowen* v. *National Life Assn.*, supra, 63 Conn. 476. Accordingly, we conclude that §§ 52-109 and 52-192a are properly interpreted as validating the offers of judgment on file as of the date of Daly's substitution as the plaintiff, which occurred on January 27, 2000,[47] rather than on the date that DiLieto commenced the action, namely, February 7, 1997.

Finally, we reject the defendants' claim that requiring them to pay offer of judgment interest in the present

[47] To avoid any possible confusion in future cases, however, a party that is substituted as a plaintiff under § 52-109 shall either repudiate the original offer of judgment upon substitution, refile that original offer of judgment, or file a new offer of judgment, at that substituted plaintiff's discretion. It is true, of course, that, as a general matter, a plaintiff is permitted to file only one offer of judgment, which may be refiled in the same amount as many times as he or she chooses. See General Statutes (Rev. to 1997) § 52-192a; see also *Shawhan* v. *Langley*, 249 Conn. 339, 345–46, 732 A.2d 170 (1999). When, as in the present case, however, an offer of judgment has been filed by the original plaintiff and, thereafter, a new plaintiff is substituted into the case, we see no reason why the substituted plaintiff should be precluded from filing a new offer of judgment when that original offer of judgment was invalid when filed; in addition, the correct plaintiff should not be denied the opportunity to file his own offer of judgment, unfettered by the offer filed by the incorrect plaintiff. Finally, we note that, in light of the issues raised by our resolution of this claim, the legislature and the rules committee of the Superior Court may wish to clarify the procedures applicable to offers of judgment when a plaintiff is substituted for the original plaintiff under § 52-109.

case will encourage unscrupulous plaintiffs who have sought bankruptcy protection to commence and settle their cases without the knowledge of the bankruptcy trustee. This argument founders on the fact that neither § 52-109—which, by its terms, pertains only to actions that were commenced by the wrong party "through mistake"—nor any other statutory provision or rule of practice will be applied to benefit a plaintiff who engages in such fraudulent conduct. In light of the trial court's uncontested finding that DiLieto filed and litigated the present action in the good faith belief that she was entitled to do so, our conclusion that the defendants are liable under § 52-192a for their failure to accept the offers of judgment that DiLieto had filed will in no way encourage bankruptcy fraud.

## IV

We turn next to the defendants' claim in the second appeal (Docket No. SC 17471), namely, that the trial court improperly concluded that certain pathology slides containing recuts of DiLieto's uterine tissue were patient "health record[s]" under § 19a-490b (a) and, therefore, that the defendants were required to disclose them to DiLieto. We conclude that the defendants' claim is moot because, during the pendency of this appeal, the slides were disclosed to DiLieto and they since have been returned to the defendants. Accordingly, we dismiss the second appeal for lack of jurisdiction.

The following facts and procedural history, which are set forth in *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 265 Conn. 79, 828 A.2d 31 (2003), are relevant to our disposition of the defendants' second appeal. "After learning that Yale had done further 'recuts' of DiLieto's original tissue block, [Daly] filed an interrogatory requesting that Yale disclose any slides made from DiLieto's tissue and the results of any testing performed on the slides. Yale opposed [Daly's] request

on the grounds that [as] the trustee in bankruptcy [Daly] could not exercise DiLieto's rights under [General Statutes (Rev. to 2003)] § 20-7c[48] and that the pathology slides were work product.

"After extensive argument on the issue, the trial court concluded that [Daly] was not entitled to the slides pursuant to § 20-7c. The basis for the court's conclusion was that the statute was designed to provide patients with health care information and, as such, the statute provided DiLieto with a personal right that could not be exercised by [Daly as] the plaintiff bankruptcy trustee." Id., 98–99. In *DiLieto* v. *County Obstetrics &*

---

[48] General Statutes (Rev. to 2003) § 20-7c provides in relevant part: "(a) (1) A provider, except as provided in section 4-194, shall supply to a patient upon request complete and current information possessed by that provider concerning any diagnosis, treatment and prognosis of the patient; and (2) a provider shall notify a patient of any test results in the provider's possession that indicate a need for further treatment or diagnosis.

"(b) Upon a written request of a patient, his attorney or authorized representative, or pursuant to a written authorization, a provider, except as provided in section 4-194, shall furnish to the person making such request a copy of the patient's health record, including but not limited to, bills, x-rays and copies of laboratory reports, contact lens specifications based on examinations and final contact lens fittings given within the preceding three months or such longer period of time as determined by the provider but no longer than six months, records of prescriptions and other technical information used in assessing the patient's health condition. No provider shall charge more than forty-five cents per page, including any research fees, handling fees or related costs, and the cost of first class postage, if applicable, for furnishing a health record pursuant to this subsection, except such provider may charge a patient the amount necessary to cover the cost of materials for furnishing a copy of an x-ray, provided no such charge shall be made for furnishing a health record or part thereof to a patient, his attorney or authorized representative if the record or part thereof is necessary for the purpose of supporting a claim or appeal under any provision of the Social Security Act and the request is accompanied by documentation of the claim or appeal. A provider shall furnish a health record requested pursuant to this section within thirty days of the request. . . ."

We note that the legislative history of § 20-7c "confirms that the [statute] was intended, principally but not exclusively, to provide patients [with] a right to examine and to obtain copies of their health records prior to the initiation of malpractice litigation." *Cornelio* v. *Stamford Hospital*, 246 Conn. 45, 56, 717 A.2d 140 (1998).

*Gynecology Group, P.C.*, supra, 265 Conn. 98, 102, we upheld the trial court's determination that Daly did not have standing under § 20-7c to request DiLieto's health records.

After the case was remanded for a new trial, DiLieto filed a motion to intervene for two purposes,[49] one of which was to obtain the tissue slides that Yale had refused to turn over to Daly. Relying in part on this court's decision in *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, supra, 265 Conn. 79, the trial court granted in part DiLieto's motion to intervene "for the limited purpose of seeking discovery through this case concerning the tissue specimen in question and, if successful, turning any evidence over to [Daly] for possible use at trial." Yale, however, persisted in its refusal to turn over the slides on the ground that they were not health records but, rather, nondiscoverable work product. DiLieto then filed a motion to compel their production under "General Statutes §§ 20-7c and 19a-240b."[50] In her motion, DiLieto argued, inter alia, that it was vitally important that she be permitted to examine the slides because, although her own physicians had determined that she never had cancer, Yale was taking the opposite position in Daly's malpractice action. The trial court granted the motion in part, concluding that DiLieto had a "compelling interest" in obtaining the slides. The trial court also determined, however, that evidence derived directly or indirectly from DiLieto's inspection of the slides would not be admissible in the trial of the malpractice action.

DiLieto appealed from that portion of the trial court's decision precluding her from using evidence derived

---

[49] The other purpose, which is not relevant to this appeal, was "to monitor the proceedings . . . and [to] participate as necessary as an interested party . . . ." The trial court denied DiLieto's motion to intervene for this purpose.

[50] Although DiLieto cited § 19a-240b, a nonexistent statute, it is apparent that she meant § 19a-490b, the provision that she cited throughout the remainder of the motion.

from her inspection of the slides in the malpractice action, and the defendants cross appealed from that portion of the decision ordering them to disclose the slides. During the pendency of the appeal, however, Yale turned the slides over to DiLieto, who had them evaluated by her own expert. DiLieto then returned the slides to Yale and withdrew her appeal. In her brief to this court, DiLieto claims that the defendants' cross appeal is moot because she has received the slides, and, therefore, this court can provide no practical relief in connection with the defendants' cross appeal. The defendants contend that they can be afforded practical relief because, when DiLieto returned the slides to Yale, she reserved her right under § 19a-490b to have the slides inspected again in the future, and she also claimed the right to use the slides in any retrial of the present case in the event that the defendants prevail in the present appeal.

"It is axiomatic that if the issues on appeal become moot, the reviewing court loses subject matter jurisdiction to hear the appeal. . . . Mootness implicates [this] court's subject matter jurisdiction and is thus a threshold matter for us to resolve. . . . It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . An actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Citation omitted; internal quotation marks omitted.) *Sullivan* v. *McDonald*, 281 Conn. 122, 125, 913 A.2d 403 (2007).

We agree with DiLieto that no practical relief can be afforded to the defendants by virtue of a reversal of

the trial court's decision to require disclosure of the slides because the slides already have been disclosed. With respect to the defendants' claim that their appeal is not moot because DiLieto has reserved the right to inspect the slides again, in oral argument before this court, DiLieto's appellate counsel expressly disavowed any such intent. Indeed, we can perceive of no reason why DiLieto would have any future need to inspect the slides in view of our disposition of the defendants' appeal in Docket No. SC 17744 in Daly's favor. Our decision in that appeal affirming in part the judgment of the trial court also disposes of the defendants' contention that practical relief still can be afforded to them because the plaintiff might seek to use the slides in a retrial of that action. Accordingly, the defendants' claim in their second appeal is dismissed as moot.

With respect to the appeal in Docket No. SC 17744, the judgment is reversed as to the award of offer of judgment interest and the case is remanded to the trial court with direction to vacate that award and to award Daly offer of judgment interest accruing from the date of his substitution as the plaintiff; the judgment is affirmed in all other respects. The appeal in Docket No. SC 17471 is dismissed.

In this opinion the other justices concurred.

